## MARY S. P. GIBBES AND OTHERS *vs* JAMES L. GUIGNARD AND OTHERS.

The rule in reference to the effect of a responsive answer, as evidence for the respondent, has undergone some change, the later doctrine being that the evidence of one witness, corroborated by such circumstances as satisfy the judicial mind, is sufficient to contradict it, although the circumstances may not be equal to the evidence of another witness, and those circumstances may, it seems, be found in the statements of the answer itself.

Bill by *cestui que trust* against trustee, for account, alleged that plaintiff requested defendant to make no investments of the trust funds in Confederate securities, and she believed he had abstained from so doing, but that, after that class of securities had become nearly worthless, he had substituted some of his own in place of his indebtedness to the plaintiff; and called on defendant to answer whether he did, at any time, and, if yea, at what time or times, in particular, and from what person or persons, purchase for plaintiff, or invest her funds, in his hands, and, if yea, to what amount in Confederate States bonds. Defendant, in his answer, stated, in effect, that he did invest, between February and September, 1863, $10,000 of plaintiff's funds in Confederate States bonds; that the purchases were made from a great many different persons, and, generally, in small amounts from each; and that he did not remember the names of the persons from whom he purchased, except two, whose names he gave: *Held*, That the answer was not responsive to the bill.

The evidence of the plaintiff, with the corroborating circumstances, *held* sufficient to contradict the answer, assuming it to be responsive.

The appointment, or substitution of a trustee, without security, will not be sanctioned except under extraordinary circumstances.

### BEFORE BOOZER, J., AT RICHLAND, AUGUST TERM, 1869.

The case was first heard before His Honor Chancellor Johnson, in June, 1867. His decree is as follows:

JOHNSON, Ch. In 1841, James S. Guignard, Sr., in consideration of the natural love and affection which he had for his daughter, Mary S. P. Gibbes, the wife of James W. Gibbes, conveyed to James S. Guignard, Jr., a house and lot in the city of Columbia, in trust, that he should hold the same for the sole and separate use, benefit and behoof of his said daughter, for the term of her natural life; and, after her death, for the use, benefit and behoof of such person or persons as she, by her last will and testament, made notwithstanding her coverture, might devise the same; and if she should die without making any disposition, by will or otherwise, then that the property should be " in trust for the heirs of her body, to them, or to the survivors of them, share and share alike, *to them, their heirs and assigns forever.*" The trustee, by the said conveyance, is authorized and empowered to sell and dispose of the said house and lot whenever he should be requested by the said Mary S. P. Gibbes, pro-

vided the proceeds of such sale should be laid out in the purchase of other estate, real or personal, which should be secured for the use of his said daughter and her heirs, as in the deed expressed. In July, 1844, the trustee, on the written request of Mary S. P. Gibbes and her husband, sold and conveyed the house and lot to Henry and J. C. Lyons, for four thousand five hundred dollars, and, up to the 1st of January, 1865, paid annually to Mrs. Gibbes the interest on the said amount of money.

In 1845, James S. Guignard, Sr., gave to four of his children, of whom the complainant, Mary S. P. Gibbes, was one, a number of negro slaves; and, in the division of them, the lot assigned to her was valued at twelve hundred and sixty dollars, and was sold by her and her husband to James S. Guignard, Jr., for fourteen hundred dollars; and, by their request, he placed this amount with the other trust fund, making, in all, five thousand nine hundred dollars, on all of which he paid the interest up to the time aforesaid.

In the year 1856, James S. Guignard, Sr., died, after having first duly executed his last will and testament—in which he appointed his two sons, John Gabriel Guignard and James S. Guignard, Jr., the executors thereof; and the latter alone qualified, after having proved the will. In it there are various devises and bequests— some of the latter being bequests of money to Mary S. P. Gibbes— and, in the thirty-sixth clause of the will, the residue of the testator's estate is given to his five children, and to the children of a deceased child, to be divided by them in six equal portions.

And in the thirty-seventh clause of the will, it is declared to be the express will and intention of the testator that all the property willed to his three daughters, in specified clauses of the will, should "be for their sole and separate use, benefit and behoof, notwithstanding coverture, for and during their natural lives, and not to be in any way subject to, or liable for, the debts or contracts of their present or future husbands; and, after their deaths, the same to revert and belong to their respective children, and to the survivors or survivor thereof, *to his, her or their heirs and assigns for-ever.*"

In the answer of James S. Guignard, he acknowledges having received, as executor, under the provisions of the will, for the complainant, Mary S. P. Gibbes, in money, four thousand four hundred and thirty-eight dollars and three cents—making the aggregate principal sum in his hands, from all sources, for the said complainant, ten thousand three hundred and thirty-eight dollars and three

cents. It also appeared from the evidence that the interest on the four thousand four hundred and thirty-eight dollars and three cents had been paid, annually, up to the 1st of January, 1865.

The answer of James S. Guignard, in response to the allegations of the bill, alleges that he invested, under the provisions of the Act of 1861, the whole amount which he held for M. S. P. Gibbes, as aforesaid, in 8 per cent. bonds of the Confederate States, between the months of February and September, 1863. The complainants deny that he made such investment, and that, if he did do it, it was improperly done, and should not be allowed.

Was the investment made? and, if so, was it properly done? are the important questions in the case, and must be determined mainly by the evidence, if not entirely.

Mary S. P. Gibbes testified that she lived in the office of Dr. Gibbes, from September, 1863, till August, 1864; and that some time after she went to live there—either late in 1863, or early in 1864—the defendant, James S. Guignard, in speaking to her about his own matters, said to her, that she need not worry herself about her property as long as he had anything, for he had given his note for ten thousand five or six hundred dollars, for the balance due her by him; and that he furnished her a written statement of her property in his possession, she thought about the 1st of January, 1864, as he had been in the habit of doing from year to year; and that the first item in it was interest on his note for ten thousand five or six hundred dollars; and that she afterwards gave the same statement to her son-in-law, Thomas S. Lee, and requested him to use it in making his returns to the Confederate tax collector, as her trustee had declined to do it. She also testified that whilst she was residing in Dr. Gibbes' office, her brother, J. S. Guignard, called upon her, and asked her if she wanted him to invest her money in Confederate bonds, and that she replied to him: "No, indeed; she wanted her property invested in personal bonds;" and that, about six weeks after Gen. Sherman passed through Columbia, she was at her brother's house, and he said to her: "All your money was in Confederate bonds." To which she replied: "No, you mean in personal bonds." "Well, personal bonds, they are no better than Confederate." And that, upon his remarking to her, afterwards, that her money was in Confederate bonds, she became uneasy, and got Thomas S. Lee to go with her for the purpose of seeing her brother, and ascertaining the truth of the matter; and that, in going, they met him in the street, and she asked him how her money

was invested; and she thought, though she could not recollect the exact words, he said: "In personal bonds, but they are not much better than Confederate bonds."

Thomas S. Lee testified that Mary S. P. Gibbes handed him a written statement of what purported to be an exhibit of the estate of Mrs. Gibbes, in the hands of James S. Guignard, for the purpose of enabling him to make a return for her to the Confederate tax collector; and that, in the statement, the first item was interest on a note of James S. Guignard, which the witness thought was for ten thousand six hundred dollars; and that, about six or seven weeks after Gen. Sherman passed through Columbia, he went with Mrs. Gibbes, at her request, to see James S. Guignard, in relation to her property; and that they met him on the street, and she said to him: "Brother, tell me, is my money in Confederate or personal bonds?" To which he replied: "Personal bonds—no better than Confederate bonds."

James S. Guignard testified that he acted as the trustee of the whole fund of $10,338.03, and produced one or more receipts of Mrs. Gibbes for the interest, in which he was styled trustee, and that, in 1861, the trust fund was pretty much in money, but that he lent some of it out here and there, and that, in 1863, he found himself in the possession of the whole of it, and that it was paid in to him, mostly in 1861 and 1862. That $30,000 of his own money, and the whole of the trust money of Mrs. Gibbes, were invested by him in 8 per cent. Confederate bonds, in 1863. Mrs. Gibbes' money was invested in bonds between the 19th of July, 1863, and the 15th of December, 1863, and witness thought it was done in July. The witness produced on the stand a book, which he testified contained a statement of his transactions with the trust estate, from the first day of January, 1858, to the 25th day of November, 1864, in which the following entry was made, to wit: "Invested in Confederate bonds 8 per cent. 1— 27, $10,000." The time that the entry was made does not appear on the book, further than this, that it stands between an entry made on the 19th day of July, and one made on the 25th day of November, 1863. This is the only entry of any investment made at any time in the book; and the witness testified that he had made the investments in the Confederate bonds, at different times, and that he had purchased the bonds from different persons. The defendant, in his answer, denied that Mrs.

Gibbes had ever requested him not to invest her money in Confederate bonds. I regard the above as a fair abstract of the evidence bearing on the point, as to whether the investment was actually made by the defendant, as contended by him, or not.

Had all the investments made by the defendant of the trust funds in his hands, been regularly entered, from time to time, in the book as they were made, and, especially, if the investments of the trust funds in Confederate bonds had been regularly entered, as they were made, instead of making a lumping entry at one uncertain time, I would regard that portion of the evidence much stronger than I do. In giving the answer, and the evidence sustaining the same, all the weight to which they are entitled, I am not satisfied, in considering all the evidence together, that the investment was made by the defendant, James S. Guignard, as claimed by him; and I cannot sustain it, though it is with much hesitation that I so decide.

The question as to what estate the complainant, M. S. P. Gibbes, held under the will and deed of 1841, was made more, as I suppose, for the purpose of influencing the decision of the point just decided, than otherwise; but, for the purpose of avoiding further litigation, I think it better to adjudicate the question, as all the parties are before the Court. The opinion of the Court is, that under the will, and under the deed of 1841, she only took a life estate, and that the remaindermen take as purchasers.—See *Austin* vs. *Payne, et al.,* 8 Rich. Eq., 1; *Danner* vs. *Trescot,* 5 Rich. Eq., 355; and *Markley and Wife* vs. *Singletary,* 11 Rich. Eq., 393.

The defendant, James S. Guignard, admits that there is a tract of land in Greenville District, and various articles of personal property, which pass under the residuary clause of the will, which have not been divided according to the directions of the will; and the complainants insist that there are various other tracts of land, which are subject to division under the residuary clause of the will, which have not been divided.

It is ordered and decreed, that the foregoing opinion be taken as the judgment of the Court. It is also ordered and decreed, that the complainants have a decree against the defendant, James S. Guignard, for ten thousand three hundred and thirty-eight dollars and three cents, with interest on the same from the 1st day of January, 1855.

It is also ordered and decreed, that it be referred to the Commissioner to audit the accounts of James S. Guignard, as executor of the last will and testament of J. S. Guignard, Senior, so as to as-

certain the amount actually due Mary S. P. Gibbes, as life tenant under the same; and that he so report, with leave to report any special matter.

It is also ordered and decreed, that a writ of partition do issue to Commissioners, in accordance with the rules of this Court, to divide the tract of land in Greenville District amongst the parties entitled to the same. And it is also ordered and decreed, that further orders may be taken at the foot of this decree.

From that decree, an appeal was taken, on the grounds:

1. Because the defendant having, in response to the allegations and interrogatories of the bill, averred on oath that the funds of Mrs. Gibbes, the complainant, were invested by him in Confederate bonds, the Chancellor has erred in considering this positive averment to be overweighed by the testimony of Mrs. Gibbes and her son-in-law, as to their recollection of statements made by the defendant, not necessarily contradictory of this averment.

2. Because, assuming the correctness of the Chancellor's conclusion as to this fact, he has erred in decreeing thereupon, against the defendant, an absolute indebtedness for the whole amount of said investment, instead of decreeing an account as for an investment in personal bonds.

3. Because the decree, in providing for the present payment of the principal fund and interest, is inconsistent with the terms and provisions of the instruments of writing from which that fund is derived.

On that appeal a judgment was delivered by the late Court of Appeals, at May Term, 1868, as follows:

GLOVER, J. Not satisfied that the investment in Confederate bonds was made by J. S. Guignard, the Chancellor ordered that the complainants have a decree for $10,338.03, and interest thereon from January 1st, 1865. He also ordered that it be referred to the Commissioner to audit the accounts of J. S. Guignard, as executor, so as to ascertain the amount actually due the plaintiff, M. S. P. Gibbes, as life tenant under the will, with leave to report any special matter.

It was with hesitation that the Chancellor refused to sustain the investment, and he says, if the investments had been regularly entered as they were made, the evidence sustaining them would have been stronger. The only evidence to prove the investments

was the answer and the testimony given by the defendant as a witness examined in the cause; and if the answer is responsive to the material allegations of the bill, it is conclusive proof, unless contradicted by two witnesses, or one witness, corroborated by circumstances, according to the nature of the case. Governed by this rule, we entertain the doubts that embarrassed the Chancellor in the application of it to this cause. The only charges in the bill, to which the fact of investment by the defendant would be responsive, are, that the plaintiff requested the defendant not to invest in Confederate securities, and that she believed he had abstained from such investment.. The answer to a bill, simply praying for an account, is not conclusive proof, and such defence would be only in avoidance, and, like every other independent defence, must be proved. If, besides an account, a discovery is sought to sustain the plaintiff's case, the defendant must answer fully, and would be entitled to the benefit of the rule. It is not clear that the defendant's answer to the bill, respecting the investment in Confederate bonds, is strictly responsive to any fact charged in the bill; or that the plaintiff asks more than an account from her trustee. The defendant has filed, as an exhibit, with his answer, a schedule of his account; and his book, from which the schedule was extracted, was, also, offered in evidence. We do not assume to decide whether the defendant's evidence, as a witness, and his book, in which his debits and credits, as trustee, are entered, may not deserve great consideration in proof of the investment, independent of the answer; but he should be entitled to avail himself of all the benefit that such evidence can afford. His book shows but one entry embracing an investment in Confederate bonds, yet his answer states that these investments were made, from time to time, between February and August, 1863. We agree with the Chancellor, that if the entry of these investments had been regularly made, the evidence would have been stronger, and we are of opinion that the defendant should have an opportunity to explain his book in this respect.

It was argued that a separate estate having been given to the plaintiff, during discoverture the relation between her and the defendant, of trustee and *cestui que trust*, ceased. When the ownership of the wife in separate property is absolute, the principle contended for may apply—the right of disposition fluctuating between coverture and discoverture—that she may be protected against an improvident husband during his life, and, when sole, enjoy the free control of the property; but when her separate estate is for life,

Gibbes *vs.* Guignard.

and others are interested as remaindermen, her disposition, while sole, is limited to the rents and profits. By the deed, dated May 4, 1841, J. S. Guignard is expressly named as trustee, and the uses and trusts are declared, and, as executor of his father's will, he stands in the same relation to the plaintiff, M S. P. Gibbes—not in a technical sense, but as a trustee—like all who hold property for the benefit of others. The general assets in the hands of an executor may not be affected with a trust; but when the debts and legacies are paid, and the residue is ascertained, or when a legacy is set apart from the general fund, his representative character ceases, and the rules respecting trust property apply. From 1857 to 1864, the plaintiff recognized the defendant as her trustee, and some of her receipts are given to him in that character. It is a continuing trust, and she is entitled to the annual income during her life, but not to the possession and control of the *corpus*. It is premature, and not necessary that we·should express any opinion respecting the estates of the parties under the will or deed beyond the interest of the plaintiff, M. S. P. Gibbes.

. It is, therefore, ordered, that the Circuit decree be set aside, and the cause be remanded to the Circuit Court.

It is further ordered, that, on the re-hearing of the cause, the evidence already taken be read; and that any party to the proceedings be permitted to introduce any additional evidence touching the investment in Confederate bonds.

Dunkin, C. J., and Wardlaw, A. J., concurred.

The defendant had died (in February, 1868,) before the hearing in the Court of Appeals, and, in August, 1868, a second hearing was had in the Circuit Court of Equity, before His Honor Chancellor Lesesne. Additional evidence was taken, but His Honor failed to make a decree before the 1st January, 1869, when his office expired by the limitation of the new Constitution. An order, by consent, was then entered, dated 20th January, 1869, appointing His Honor the late Chancellor Lesesne "Special Referee in the case, and that his report be taken and deemed to be the decree of the Circuit Court, subject to be appealed from, as in other cases." His report, in pursuance of the said order, dated 10th January, 1869, is as follows:

· Lesesne, Referee. The bill is against Mr. Guignard, for an account of a fund or funds in his hands, in which Mrs. Gibbes, the

plaintiff, is interested, and, also, for discovery as to certain points connected with the investment of the same. The principal of the fund consists of three sums, amounting, together, to $10,338.03, namely: 1. The sum of $4,500, being the proceeds of sale of a house in the city of Columbia, which, by deed, bearing date in 1841, was conveyed by James S. Guignard, the elder, to this defendant, James S. Guignard, in trust, for the sole and separate use of the plaintiff, Mary S. P. Gibbes, during her life, with certain limitations over, with a power of sale at her written request, the proceeds of sale to be invested in other property, real or personal, to the same uses. The sale was regularly made in July, 1844, and the price went into the hands of the trustee. 2. The sum of $1,400, the price of certain negroes of the plaintiff, sold by her and her late husband, to the said defendant, in the year 1845, which the defendant placed with the trust funds. 3. The sum of $4,438.03, being the amount of certain bequests to Mrs. Gibbes, under the will of the said J. S. Guignard, the elder, of which the defendant, J. S. Guignard, was executor. This last sum is subject to the trusts of the said will, namely: for the sole and separate use of Mrs. Gibbes during her life, with certain limitations over. The interest on these three several sums was paid by the defendant to Mrs. Gibbes up to January, 1865.

The bill also seeks a partition of the residue of the estate of testator, of which Mrs. Gibbes is entitled to a distributive share of one-fifth, subject to the same trusts as the legacies before mentioned.

The defendant declares, in his answer, that he kept the entire fund invested in personal securities (not specified,) all of which were paid up, chiefly in the years 1861 and 1862, and in the year 1863, between the months of February and August, invested, from time to time, as opportunities offered, in Confederate States securities, which, at the close of the war, became valueless. He kept an account with the plaintiff in a book, a copy of which, beginning in 1857, and ending November 30, 1864, forms an exhibit to his answer. In that account is an entry in the following terms:

"Invested in Confederate 8 per cent. and one or two 7 per cent. bonds, $10,000."*

---

*NOTE.—I am satisfied, from an inspection of the original, (although the writing is obscure,) that this is correct. In the copy of the account filed as an exhibit to the answer, the entry is given thus: "Invested in coupon bonds, 8 per cent, $10,000."

It is without date, but the items next preceding and following it are dated, respectively, July 19, 1863, and December 15, 1863.

The said cause was heard before the late Court of Chancery in July, 1867, upon the bill and answers, and testimony adduced by the parties, and the presiding Chancellor pronounced a decree against the defendant, J. S. Guignard, in favor of the plaintiff, Mrs. Gibbes, for the sum of $10,338.03, with interest thereon from the first day of January, 1865. He also ordered a writ of partition to divide a tract of land in Greenville County (forming the residue of testator's estate, or a part thereof,) among the parties entitled thereto. From this decree an appeal was taken, and the Court of Appeals, in their decree, made at May Term, 1868, ordered "that the Circuit decree be set aside, and the cause be remanded to the Circuit Court; and that, on the rehearing of the cause, the evidence already taken be read, and that any party to the proceedings be permitted to introduce any additional evidence touching the investment in Confederate bonds."

The testimony that was adduced at the hearing in 1867 forms part of the appeal brief, which, together with the appeal decree, will accompany this report. The cause has been argued before me with signal ability by the counsel of both parties, and additional testimony was introduced, which will also accompany this report. The great question in the cause is, whether the alleged investment in Confederate securities shall be sustained. In the words of the Chancellor, in the Circuit decree: "Was the investment made, and, if so, was it properly done? are the important questions in the case." He then proceeds to consider the former of them, and concludes that the investment was not, in fact, made, leaving, of course, the other untouched. In the argument of defendant's counsel, it is assumed as *res adjudicata* that the defendant was trustee of Mrs. Gibbes as to all three of the funds. But I do not so understand the decrees. They only decide *that*, as to the fund derived from the sale of the house, and the fund which she acquired under the will of Mr. Guignard, the elder. Nor do I so understand the fact, as to the remaining fund, which arose from a sale by Mrs. Gibbes to the defendant of her own absolute property. As to it, I regard him as standing simply in the relation of debtor to her. The fact that he kept it in the same account with the two trust funds, and in paying her annually, in one payment, the interest on all three, took her receipt from her as trustee, does not, in my judgment, amount to a recognition of him as trustee, or constitute him a trus-

tee, with respect to the debt in question. So long as she was content to allow the principal to remain in his hands, and to receive only the annual interest, it was quite natural and very convenient that he should keep his account of it together with the other funds, as to which it was his office, as trustee, to pay the income annually.

As to the fund arising from the sale of the house, the trust deed directs expressly that, in case of a sale, the proceeds shall be invested in other property, real or personal. The plaintiff contends that omission so to invest, (if there was such omission,) was a breach of trust, and the defendant's counsel insists that she sanctioned the omission, and there was, therefore, no breach of trust as to her, whatever there may be as to the remaindermen. If she did, in fact, sanction it, the counsel's position is certainly correct. His conclusion, however, rests on the facts that he accounted to her annually for interest on the fund, and that she gave receipts accordingly. But it does not appear that he ever informed her that he had used her money for his own purposes, and was paying interest out of his pocket. Such an admission would be inconsistent with the defence set up, and fatal to it. The defence is, that he, in truth, always kept her moneys invested in bonds and notes up to a certain time, when those investments were converted into Confederate securities. If any explanation was given in the annual settlements as to the source from which the income came, to be consistent with the defence, it must have been that the income was the fruit of those bonds and notes. And her giving receipts for interest, generally, cannot now be construed as sanctioning his use of the money on interest. If, in fact, he so used the money, he committed a breach of trust. The judgment of the Chancellor was, as I have remarked, that no investment of the funds in question was, in fact, made in Confederate securities. That was conclusive of the case against the defendant, and the Chancellor accordingly confined himself to the consideration of that question. The Court of Appeals, too, remanded the cause to the Circuit Court, to allow the defendant to "explain his book," and to introduce further testimony "touching the investment in Confederate bonds." Neither the Circuit decree, nor that of the Court of Appeals, discusses, or even refers, to the other important questions propounded by the Chancellor, namely: whether, if such investment were made, "it was properly done." This Court is not, therefore, precluded from the consideration of that question. It is one of the issues in the cause, was left open, and was fully discussed before me by the counsel on

24

both sides. According to my view, it is proper, if not necessary, to consider it. In the opinion I have formed, it must be decided adversely to the defendant, and I would gladly pass by the question of fact as to the investment. But I cannot avoid it, inasmuch as my opinion on the other question may not receive the sanction of the Supreme Court. I, therefore, proceed to its consideration.

The new testimony adduced before me does not shed much, if any, additional light on the subject; and I do not find it necessary to lengthen this paper by commenting on all of it, or of that which was adduced at the previous hearing. All, as I have said, will accompany this report. Mr. Guignard, the defendant, had died very suddenly before the hearing, and it was agreed, by counsel, that, if necessary, his administrator, J. S. Guignard, should be considered a party to the cause, and a consent order to that effect be entered, at any time, *nunc pro tunc.* The counsel for the defence insisted that due weight was not given in the Circuit decree to the answer; that an answer which is responsive to the bill is evidence, and conclusive, unless contradicted by two or more witnesses, or by one witness and corroborating circumstances, or by corroborating circumstances alone, if sufficiently strong, or unless the answer overcomes itself by statements which are inconsistent with the response it contains. These points were discussed and sustained with great ability and research. The answer in this case, as to the fact of the investment of plaintiff's money in Confederate States bonds, was claimed to be responsive, and it was denied that it has been overcome in any of the ways mentioned.

But the Court of Appeals say it is not clear that the answer respecting the investment in Confederate States bonds is strictly responsive to anything charged in the bill, or that the plaintiff asks more than an account from her trustee. The plaintiff charges in her bill that he abstained from investing her funds in Confederate securities until some time in the year 1865, when said securities, having become almost if not entirely worthless, he transferred to her credit, or marked with her name, certain Confederate bonds, which he had previously purchased for himself, in payment of his indebtedness to her, and propounds an interrogatory in these terms: "Whether he did at any time, and, if yea, at what time or times, in particular, and from what person or persons, purchase for her, or in her name, or invest her funds in his hands, and, if yea, to what amount, in the purchase for her of Confederate States bonds; and whether he did not at some time, and when, transfer to her credit,

or mark for her, certain Confederate States bonds, and, if yea, what bonds, and to what amounts then in his possession, and which he had purchased for his own use, in lieu of and substitution for his own note, or other and what obligation or acknowledgment of indebtedness, which was held by him for her use?"

In his answer, the defendant declares that he did not abstain from investing plaintiff's funds in Confederate States securities; but that, on the contrary, he did so invest, during the year 1863, not only the aforesaid sum of $10,338.03, but, also, very largely for himself; that all of her money in his hands was invested in 8 per cent. coupon bonds between February and August, 1863; that they were, originally, purchased for her. And his response to the interrogatory is in the words following: "As to so much of the said bill as requires this defendant to answer at what time and from what person or persons he purchased for the complainant, Mary, any Confederate States bonds, he answers that said purchases were all made between the month of February, 1863, and the first day of September of the same year; but said purchases, having been made from a great many different persons, and generally in small amounts from each, he is unable to remember from whom all of said bonds were purchased. This defendant, however, does remember that he purchased some of said 8 per cent. bonds for the said Mary from Thomas Graves, of Mississippi, Henry Willis, a broker, then in Columbia, and others. As to so much of said bill as requires this defendant to answer if he did not at some time, and when, transfer to the credit of the said Mary, or mark with her name, certain Confederate bonds which he had purchased for his own use, in lieu of his own note, or other obligation or acknowledgment of indebtedness, this defendant answers: No; that no such transfer or substitution was ever made, or attempted to be made, by him, nor were any of said bonds marked with the name of the complainant, the said Mary. The said bonds, *as they were purchased*, were entered in the account of said defendant, as trustee, *at and as of the date of said purchases, or very shortly thereafter;* and the original purchases were made for the benefit, and with the funds, of the said Mary, in this defendant's hands as trustee as aforesaid." And the account before mentioned forms an exhibit to the answer, as "a statement of his receipts and expenditures," and is, of course, part and parcel of the answer.

The answer, as above quoted, is not, perhaps, as full and minute as the plaintiff required, and had the right to require that it should

be. Still, if borne out in its statements, it might be properly regarded as responsive to the bill, and entitled to the force and effect which appertain to a responsive answer. The material part of it is, that the "bonds, as they were purchased, were entered in the accounts of the defendant, as trustee, at and as of the date of said purchase, or very shortly thereafter." If the defendant could rightfully have stopped here, and had done so, the *onus* of disproving the fact of the alleged investments might have been thrown on the plaintiff. But the bald statement thus made was not enough. It was the plaintiff's right to require, in verification of it, the production of the account referred to. The defendant knew this, and, accordingly, exhibited his account as part and parcel of his answer. But, so far from showing that the investments were entered when the several alleged purchases of bonds were respectively made, as the answer shows he knew that they should have been, and as they naturally would have been, it contains a "lumping entry" of the entire amount, dated months after the time at which he says he commenced making the investments—a general, inexact entry of eight per cent. bonds, and one or two seven per cent. bonds, amounting to $10,000. The answer, in my judgment, overcomes itself, or, at any rate, is not so full to the point as to be entitled to the effect which belongs to a responsive answer. And, beside it, the testimony fails to show that the investments claimed to have been made were in fact made. Even his own deposition as a witness comes short of it. He says he "had a memorandum put round those (the bonds) for the trust estate just before Sherman passed through Columbia," (February, 1865.) These were shown, but it does not appear that they, or any other particular bonds, were purchased for the plaintiff at the times mentioned in the answer. I see no reason, therefore, for dissenting from the conclusion of Chancellor Johnson, that the alleged investment of $10,000 in Confederate States bonds has not been legally proved.

But, supposing such investment to have been made, " was it," in the words of the Chancellor, "properly done?"

If the defendant (as to those portions of the fund in question which belonged to the trust estate) was really "holding funds for investment" in 1863, I would feel no difficulty in sustaining the investment of them in Confederate States bonds, and that independently of the Act of 1861 in relation to such investments by trustees. Such is the judgment of the late Court of Appeals, in the case of *Haile* vs. *Shannon*, (MS., 1866.) But I do not consider

the defendant as, in fact, having had money in his hands for investment in the sense intended. The account filed with his answer is, in its terms, a money account. He credits the trust estate with the money received from time to time, and designates it constantly as amount due her, or amount in his hand; and he annually paid her the legal interest on such amount. He says now that the fund was all the time invested in personal notes. If he had shown *that such was the fact,* and that the notes, at the time they were given, were prudent investments, they would be sustained as such, notwithstanding the discrepancy between that state of facts and the account, as was done in the case of *Whitlock* vs. *Whitlock,* (13 Rich. Eq., 165.) And then, if the notes, being past due, had been paid in 1863, I would go very far in upholding his receipt of payment and investment of the money in Confederate States securities. But he does not specify the notes, or say that they had fixed on them the character of investments, so that, if necessary, it could have been shown that they belonged to the trust estate, and were not legally his own property. There is, then, no proof of any investment having ever been made of the funds in question; and I must consider the defendant as having mingled the trust moneys with his own, and used them in such manner as he thought fit. This was a breach of duty, as has been impressively declared in the well-considered judgment of the late Court of Appeals in the case of *Spear* vs. *Spear,* (9 Rich. Eq., 184.) It made him a debtor to the trust estate—a borrower of its money.—*Sweet* vs. *Sweet,* (Speer Eq., 309.)

The case, then, stands thus: The defendant had, for many years, owed a large debt to the trust estate for moneys received as trustee, and used for his own benefit, and, late in the year 1863, he attempted to cancel this peculiar debt by paying it to himself with Confederate States notes, and then invested those notes in Confederate States securities. Will the Court sanction such a transaction? I apprehend not. There was no necessity nor reason for the payment of the debt at the date of his entry of the purchase of those securities which had not existed at any time after he incurred it—at least, so far as the benefit of his *cestui que trust* was concerned, and that should be the sole motive of a trustee, in his dealing with the trust estate. But it is very apparent that it was for his own interest. Confederate currency was then so depreciated that persons were glad to get rid of it for almost any consideration. "Fabulous prices" were paid for all sorts of property; and if this trustee had purchased property with the money of the trust estate, as it came

into his hands, he might, at the date referred to, with the proceeds of sale of a small proportion of it, have actually paid his debt in full. The Court requires that a trustee shall be faithful to his trust, and will not uphold him in a transaction that has resulted disastrously, and which, in disregard of the interest of his *cestui que trust*, was suggested by his own advantage.

I respectfully report, as the decree of the Court, that, as to the fund of ($1400) fourteen hundred dollars, the same with interest from the first day of January, 1865, be paid to the plaintiff, Mary S. P. Gibbes, out of the estate of James S. Guignard, deceased; and as to the funds of ($4,500) four thousand five hundred dollars, and ($4,438.03) four thousand four hundred and thirty-eight dollars and three cents, that the same, with interest from the same date, be paid out of said estate to a trustee or trustees, to be appointed by the Court, to be held for the uses to which the said funds were subject, respectively; that the parties have leave to apply, at the foot of said decree, for such further orders as may be necessary for carrying the same fully into effect; and that compensation for this report be provided, of such amount, and in such manner, as to the Court may seem suitable and proper. And, further, that a writ of partition issue, as ordered in the decree of Chancellor Johnson, and that J. S. Guignard, administrator of the deceased defendant, J. S. Guignard, be made a party defendant in the cause, *nunc pro tunc*, as of the sixteenth day of June, 1868.

It appears that there was a petition in the cause, to the late Court of Equity, by the plaintiff, for the appointment of Thomas S. Lee as her trustee, in the room and stead of James S. Guignard, deceased, and a favorable report thereon, dated November 14, 1868, by D. B. DeSaussure, Esquire, the Commissioner of said Court. And I respectfully recommend that the said Thomas S. Lee be so appointed trustee, and be invested with all the powers and rights, and subjected to all the liabilities which attached to the said James S. Guignard, in his lifetime, in respect to all the property of which the said James S. Guignard was trustee for the said plaintiff.

At August Term, 1869, the report was confirmed by an order of the Circuit Court, His Honor Judge Boozer presiding. The order is as follows:

BOOZER, J. On hearing the report of the Special Referee in this case, and on motion of Messrs. Fickling & Pope, complainants' solicitors, it is

Ordered, that the same be confirmed, and made the order and decree of this Court, subject to the right of appeal, as provided for in a former order.

It is further ordered, that Thomas S. Lee be appointed trustee, without security, of Mrs. Mary S. P. Gibbes, in the room and stead of James S. Guignard, deceased, and be invested with all the rights and powers, and subjected to all the liabilities which attached to the said James S. Guignard, in his lifetime, in respect to all the property of which the said James S. Guignard was trustee for the said Mary S. P. Gibbes.

The defendant appealed, and now moved this Court to reverse the order of His Honor Judge Boozer, confirming the report of the Referee, on the grounds :

Because, according to the proof, (1,) the fund with which the decree charges the defendant, James S. Guignard, was held by him as trustee, and it was his duty to invest the same at interest ; (2) that, in good faith, and under the sanction of law, he did invest the same in the bonds of the Confederate States ; (3) that such investment was, under the circumstances, a proper investment ; and, (4,) that, without fault on his part, the same has been lost to the estate, and the defendant cannot be charged therewith.

*Carroll & Melton,* for appellant, made the following points :

I. The answer is *responsive* to the bill, and is entitled to the full force and effect which appertain to a responsive answer.

II. The answer is not overcome in any of the ways required by the equity rule.

III. The answer and testimony conclusively show that the fund in question was held for investment ; that it was, in good faith, invested in bonds of the Confederate States, in the year 1863 ; and that it was, under the circumstances, a proper investment.

IV. The report of the Referee is based upon erroneous views of the law ; upon a disregard of the rules of evidence ; upon an erroneous assumption of facts ; and upon a *presumption* of bad faith in defendant, wholly unwarranted by the testimony ; and the decree thereupon should be reversed.

*Fickling, Pope,* contra.

March 28, 1870.   The opinion of the Court was delivered by

Moses, C. J.   There are two leading questions in the cause:

*First.* Was the investment, as alleged in the answer, made?

*Second.* If made, is it such an investment as the Court of Equity will sanction?

To sustain the fact of the investment, the answer of the defendant, James S. Guignard, Jr., the trustee, is claimed to be entitled to the full force and effect of a responsive one.

That such is not its character, we think, has been adjudged by the decree of the late Court of Appeals.   In addition to its expression on this point, it extended to the defendant "an opportunity to explain his book, in respect to the investment, with liberty to either party to the proceedings to introduce any additional evidence touching the investment in Confederate bonds."   There would have been no necessity to open the case for further testimony, on the part of the defendant, if the answer had been so considered.

It is due, however, to the learned counsel who, in his argument, has exhibited so much ability and zeal, if the decision of the Court on the character of the answer is doubtful, that we should examine the question by all the lights which his research and investigation have furnished.

It is admitted, in the opinion of the Court of Appeals, that where "the answer is responsive to the material allegations in the bill, it is conclusive proof, unless contradicted by two witnesses, or one witness, corroborated by circumstances, according to the nature of the case."

The circumstances and facts, which are to stand in the place " of a second witness," need not be of such a character as to force conviction by their own impression.   If they so confirm the evidence of the witness contradicting the denial of the answer as to satisfy the judicial mind that it is either wilfully false, or, by mistake or misapprehension of the events of which it speaks, is founded on wrong assumptions, their effect will be to require the denial to be sustained by independent proof; and, if this is not furnished, the allegations of the bill will be taken as true.   The course, in relation to the force of a responsive answer, has undergone some change. The more modern inclination is rather to assimilate the rules of evidence in the Courts of Equity to those which prevail in the Courts of Law.

Chancellor Wardlaw, in *Cloud* vs. *Calhoun*, 10 Rich. Eq., 366,

says: "The modern course of Courts of Equity is to restrict the effects of an answer as evidence. Any other course puts the case of a plaintiff too much within the disposal of an unconscientious adversary." In this, he is sustained by Chief Justice Marshall, in *Clarke* vs. *Van Reimsdyck*, 9 Cranch, 153, and by Greenleaf, in his note at page 280 of his third volume.

The bill here sought an account from the defendant of the funds held by him in trust for the plaintiff, Mary S. P. Gibbes, for life, with certain remainders, in which the other plaintiffs assert an interest. It charged that she was entitled, as tenant for life, under the will of her deceased father, James S. Guignard, the elder, of which her brother, the said defendant, was executor, to certain specific devises and bequests, and that, claiming of him an account, and the payment of what might be thereon due her, and partition of the residue of the estate, he had refused compliance with her requests, always averring that he held, as her trustee, under the will, his own note for the sum of $10,000, the interest of which he had paid her to 1864.

That, at the beginning of the war, she had earnestly requested him not to invest any of her funds in Confederate securities; but, on the contrary, advised him to invest them in building on land in the city of Columbia, which he declined; that she believed that he did abstain from making investments for her in Confederate securities until 1865, when they, having become almost, if not entirely, worthless, he, as she is informed and believes, assumed to transfer to her credit, or mark with her name, certain Confederate States bonds, which he had before purchased for his own use, in payment and satisfaction of his indebtedness to her; and, on October 13, 1865, informed her that all was lost, and that he then held a package of said bonds for her of $10,000 or $10,600; that she then, for the first time, became aware of his attempts to dispose of her separate estate, and cancel his acknowledged indebtedness, by the substitution of securities which he knew were absolutely worthless; that, still refusing to render any account of his actings and doings as trustee, or to pay what may be due her, she prays that he may be required to account; and, after a prayer for partition of the real estate of the testator, and the interpretation of a certain clause in the will, follows a general prayer for relief.

In addition to the interrogatories, which but, in effect, repeat the charges made, the defendant is required " to answer whether he did, at any time, and, if yea, at what time or times, in particular,

and from what person or persons, purchase for her, or in her name, or invest her funds in his hands, and, if yea, to what amount, in Confederate State bonds."

The answer, setting forth the various items which, in 1863, contributed to make the trust fund of the plaintiff, in the hands of the defendant, amount to $10,388.03, denies the averment that he ever held, or declared to the plaintiff that he held, his own note for $10,000 as her trustee: that plaintiff ever requested him not to invest her funds in Confederate securities : and that he refrained from so investing them, until such securities becoming worthless, he transferred some which he owned in satisfaction of his indebtedness, as charged ; and further denies her application to invest in building, until some time in 1864, when the difficulty of obtaining materials and workmen rendered it almost impossible to build at all.   It sets forth that the funds of the plaintiff in his charge, at the beginning of the war, consisted of personal bonds and notes, and probably a part in money, and, as payments were made, he reinvested in the same way, until some time in 1863, when, finding himself in possession of her whole trust estate in currency considerably depreciated, and unable to loan at interest, his only alterna· tive was to make what was then regarded a safe and prudent investment.   That he made the purchases of the bonds between February and September, 1863, generally in small amounts, and from a great many different persons, whose names he does not remember and cannot set forth, except one Graves and one Willis, from each of whom he bought some.

That, as the bonds were purchased, they were entered in his account, as trustee, at and as of the day of the purchase, or very shortly thereafter, and he filed, with his answer, a statement of his receipts and expenditures, as her trustee.

Whether the answer be responsive, is to be determined by the charges and interrogatories.

Which of these claimed of the defendant a discovery of the securities in which he had invested the trust funds?   So far from enquiring as to the character of the investment, the bill averred that it consisted of his note, which he had abstained from converting into Confederate securities; and that, in 1865, he assumed to transfer to her credit certain Confederate bonds, which he possessed as his own, in the place of the note; and that it was not until October 13, 1865, he informed her he held a package of such bonds for her, amounting to $10,000, or $10,600.

The material charge conveyed by the allegations of the bill is, that he had substituted, in the way of payment or satisfaction, the depreciated currency which he owned on his own account. His answer, in denial of this, is responsive, but when he proceeds further, and alleges it was her own Confederate money, received by him in payment of the loan of her trust funds, from time to time, he sets up an independent matter of defence, which throws upon him the burthen of maintaining it by proof.

The interrogatory, whether he did, at any time, and if so, when, and from what person, purchase, on account of her trust interest, such securities, must be referred to, and taken in connection with the previous matter set forth in the bill. It is very true that, to some extent, every interrogatory may be considered as a distinct allegation. The purpose of the one now referred to could only be to compel a disclosure of the names of the parties from whom the purchases of the bonds were made, so that, if, in his answer, he repeated what the bill charged he had communicated to the plaintiff on the 13th October, 1865, she might possibly avail herself of the means of contradicting him.

Is the bill framed with a view to the discovery of the character of the investment made by the trustee, as ancillary to the prayer of relief by account and payment, or, substantially, is it only for an account? What was to be discovered?

The principal claim against the defendant, as stated in the bill, arose under the will of the father, and from a debt which she supposed he owed her at his death. She was the beneficiary of a fund which had passed into the hands of the defendant, who recognized and dealt with it as a trustee on her behalf. He, on his part, sets up, in defence, the loss of the whole, through an investment made by him without previous consultation with, or notice to, her; and he maintains that his answer, in this regard, is a shield which must protect him, unless he can be contradicted by two witnesses, or one witness, corroborated by circumstances, in themselves so convincing that they must be accepted as the testimony of an additional witness.

The interrogatory, which calls on him to answer "whether he did, at any time, and, if yea, at what time or times, in particular, and from what person or persons, purchase for her, or in her name, or invest her funds in his hands, and, if yea, to what amount, in the purchase for her of Confederate States bonds," is met by a response so vague and indefinite as to afford no information as to

the periods of the alleged purchases, or the persons from whom made.

The allegations in the bill do not appear to us so to negative the fact of the investment, that the assertion, in the answer, of his having made it, can be taken as evidence conclusive, unless rebutted by the testimony of a witness and corroborating circumstances.

If, however, the answer as to the investment made is to be regarded in response to the bill, still, the testimony of the plaintiff, with the independent facts so strongly confirming it, may well stand in the place of "a second witness." From the fiduciary relation which the defendant bore to the plaintiff, assuming that he was under no legal obligation to consult or confer with her, his communication of his intention to convert the whole of the funds which he had in hand for her into Confederate bonds, even as a mere matter of business, was certainly to be expected; it was natural to look for it—and, yet, neither his answer or his testimony, intimate such disclosure. It may, at least, excite surprise that a transaction, in which she was so much interested, was not made known to her at the time, or soon thereafter. The conduct of the party failing to do that which, under the circumstances, it was likely he would have done, may contribute much force to a judgment which is to be reached by a review and consideration of his acts and omissions. The defendant does say, in answer, that she was apprised of the purchase long before the failure of the Confederacy, yet he does not repeat it in his testimony, neither does he state the time when, nor the manner in which, the information was obtained. How long after the alleged investment, does not appear from his answer or his evidence.

The plaintiff, in her testimony, states, in addition, that, after General Sherman had left Columbia, (which was in February, 1865,) the defendant told her "that her money was in personal bonds, not better than Confederate;" and, soon after, he said "the money was in Confederate bonds;" and, being uneasy, to satisfy herself, she, with Mr. Lee, (at her request,) sought her brother, and, on meeting him, she asked "how her money was invested," when he replied: "In personal bonds, but they are not better than Confederate bonds." The testimony of Lee is substantially in accord with her own, as to the conversation. Although the defendant was examined after this testimony was given, he did not attempt to contradict it.

"Verbal admissions should be received with great caution; but where they are made deliberately, and precisely identified, the evidence they afford is often of the most satisfactory character."—1 Green. Ev., § 200. See, also, Gresley Eq. Ev., p. 456.

The answer itself may furnish statements which might go far to refute the very defence relied on by it. Chief Justice Marshall, in *Clarke* vs. *Reimsdyck*, already referred to, says: "There may be evidence arising from circumstances stronger than the testimony of a single witness;" and, if these are furnished by the defendant, they operate with still more force against him.

The answer states "that the bonds were bought, from time to time, as opportunities afforded, from a great many different persons, and, generally, in small amounts from each; that, as they were purchased, they were entered in his accounts, as trustee, and as of the date of the purchase, or shortly after." This is set forth as a fact, and with a particularity which forbids the conclusion that it is the language of the draftsman, and not that of the defendant. In his testimony, he says: "The entry was made in book, a lumping one," and immediately follows this by saying: "The entries were made according to the occurrence of the facts." How are these contradictory statements to be reconciled? An account current purports to contain a statement of receipts and payments, with the date of each separate transaction. When the account filed with the answer (which is a copy of that in the book) is examined, the entry proves to be a "lumping one," and without any date, except as of the year.

A reference to the account weakens the allegation that the fund was loaned out on personal security, from time to time, and, when paid in, was again put out at interest in bonds and notes. The account, so far from shewing this, exhibits the fact that, on the 1st day of January in each year, the defendant charges himself "with amount in hands," and continues thus to do, until January, 1861, inclusive. On 1st January, 1864, he credits the estate with one year's interest on $10,338.03, $723.68, which would be at a rate of interest of 7, not 8 per cent., which the Confederate bonds, as he avers, (except one or two,) bore. How was it, too, if the fund was loaned out annually, that the interest was paid quarterly to the plaintiff, as appears to have been done from 1857 to May, 1862, and what is the irresistible inference from the entry, "1860, April 2nd: To cash, ¼ interest on $9,008.03, funds in hand." Signed "S. P. G."

While we are forced, by the preponderating weight of the testimony, to adjudge that the investment alleged was not made, it is a matter of relief, that we may be permitted to say, it by no means follows that the defendant was influenced by any wilful purpose to deceive, but that he was led to a false conclusion, not with a design to do wrong, but from the imprudent act of so mixing the funds of the trust with his own, that the investment he made of the last, he supposed, in some way, attached to the first. His sudden death precluded him from the opportunity afforded by the appeal decree, "to explain his book."

The conclusion which we have reached on the point we have discussed, renders unnecessary any consideration of the other ground taken in the motion.

The decree must, however, be modified in one respect. The fourteen hundred dollars is to be regarded as part of the trust fund; it has been so treated throughout the whole case. The defendant, in his answer, states that he received it in the character of trustee. If it was but a simple debt due by him to the plaintiff, the remedy to recover it would belong to another jurisdiction. It was the proceeds of a sale of slaves made by the plaintiff and her husband to the defendant, and with their consent, and that of the donor, their father, to be held by the defendant as part of the trust estate of the said Mary S. P. Gibbes.

It appears, by the order confirming the report of the Referee, that a trustee has been substituted in the place of the deceased, J. S. Guignard, Jr., and without security. Although there is no appeal from that order, lest our want of notice of it, after it has been brought to our view by the brief, may be misinterpreted, we take occasion to say that, unless under extraordinary circumstances, we would not sanction the appointment or substitution of a trustee without security.

The order of the Circuit Court, adopting, as its judgment, the report of the Special Referee in the matter referred to him, is confirmed, except as to the said fourteen hundred dollars, with interest from January 1, 1865, which is hereby ordered and adjudged to be paid out of the estate of the said James S. Guignard, Jr., to the party properly entitled to receive it, to be held subject to the uses and limitations of the trust which originally attached to it.

Decree modified.

*Willard*, A. J., concurred.